**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------------X
PILAR B. TAYLOR,

|  |  |
|---|---|
| | Case No. |

Plaintiff,

**COMPLAINT**

-against-

**PLAINTIFF**
**DEMANDS A**
**TRIAL BY JURY**

THE CITY OF NEW YORK, NEW YORK CITY
DEPARTMENT OF PARKS AND RECREATIONS, and
MICHAEL PALAMAR, *individually*,

Defendants.
-------------------------------------------------------------------------X

Plaintiff, PILAR B. TAYLOR, by her attorneys, PHILLIPS & ASSOCIATES, PLLC,

hereby complains of the Defendants, upon information and belief, as follows:

## NATURE OF THE CASE

1.    Plaintiff brings this action charging that Defendants violated **Title VII of the Civil Rights**
**Act of 1964**, as amended, 42 U.S.C. § 2000e et. seq. ("Title VII"), the **New York State**
**Human Rights Law**, New York State Executive Law, § 296 et. seq. ("NYSHRL"), and
the **New York City Human Rights Law**, New York City Administrative Code § 8-107,
et. seq. ("NYCHRL"), and seeks damages to redress the injuries Plaintiff has suffered as a
result of being **sexually harassed, discriminated and retaliated against on the basis of**
**race (black) and gender (female)**.

## JURISDICTION AND VENUE

2.    Jurisdiction of this Court is proper under 42 U.S.C. § 2000e-5(f)(3) and 28 U.S.C. §§ 1331
and 1343.

3.    The Court has supplemental jurisdiction over the claims of Plaintiff brought under state
and city law pursuant to 28 U.S.C. § 1367.

4.  Venue is proper in this district, pursuant to 28 U.S.C. § 1391(b), based upon the fact that the claims alleged herein took place within the Southern District of New York.

## PROCEDURAL PREREQUISITES

5.  Plaintiff filed charges of discrimination upon which this Complaint is based with the Equal Employment Opportunities Commission ("EEOC").

6.  Plaintiff received a Notice of Right to Sue from the EEOC, dated June 22, 2018, with respect to the herein charges of discrimination. A copy of the Notice is annexed hereto.

7.  This Action is being commenced within ninety (90) days of receipt of said Right to Sue.

## PARTIES

8.  That at all times relevant hereto, Plaintiff PILAR B. TAYLOR ("TAYLOR" or "Plaintiff") is a resident of the State of New York and County of the Bronx.

9.  That at all times relevant hereto, Defendant THE CITY OF NEW YORK ("NYC") is a municipal corporation, located within the State of New York.

10. That at all times relevant hereto, Defendant NEW YORK CITY DEPARTMENT OF PARKS AND RECREATIONS ("P&R") is an agency of NYC

11. That at all times relevant hereto, Plaintiff was an employee of Defendants NYC and P&R.

12. That at all times relevant hereto, Defendant MICHAEL PALAMAR ("PALAMAR") is an employee holding the title of "PS-1" for Defendants, NYC and P&R.

13. That at all times relevant hereto, Defendant PALAMAR was Plaintiff's supervisor and/or had supervisory authority over Plaintiff. Defendant PALAMAR had the authority to hire, fire or affect the terms and conditions of Plaintiff's employment.

14. Plaintiff is a black Female.

15. Defendant PALAMAR is a white Male.

16.     That at all times relevant hereto, Defendants, NYC, P&R, and PALAMAR, are collectively referred to herein as "Defendants."

## MATERIAL FACTS

17.     On or about June 18, 2015, Plaintiff began her employment with Defendants, NYC and P&R, earning an hourly rate of approximately $10.00 per hour, as a "City Park Cleaner," in the borough of the Bronx. Plaintiff was offered this position through the Human Resources ("H.R.") Assistance/Job Training Program ("JTP"; together as "HR/JTP").

18.     In or around March of 2016, Plaintiff applied for and was hired as a "City Park Worker ('CPW')," for Defendants, NYC and P&R. Plaintiff held this position until she was terminated in September 5, 2017. Plaintiff earned an hourly rate of approximately $15.48 per hour, for a 40-hour work week. Plaintiff's expected salary for 2017 was approximately $29,565.42.

19.     At all times relevant hereto, Plaintiff was an exemplary employee and received compliments for her work performance.

20.     Within weeks of starting at Defendants, NYC and P&R, Plaintiff realized that the environment was permeated with employees who discriminated against her because of her race (black) and gender (female).

21.     In or around June 2015, Plaintiff heard multiple rumors of sexual activity between managing employees and H.R./JTP employees. These rumors included: Defendant PALAMAR was paying the younger JTPs, between the ages of 19 and 20, for sex; and the male workers were calling Defendant PALAMAR a pedophile.

22.     In or around September 2015, Plaintiff was assigned to District No. 6 Rosewood Park House, at Fordham and Webster Avenue (the "Rosewood Park House"). Plaintiff was

under the supervision of PS-1 Mariano Frazier ("PS-1 Frazier") and Defendant PALAMAR.

23.   In or around September 2015, Plaintiff complained to PS-1 Frazier that Associate Park Service Worker ("APSW") Bryant Lee ("APSW Lee") consistently reeked of alcohol and was driving recklessly.

24.   PS-1 Frazier reassigned Plaintiff to work on a team with CPW Rafael Santos ("CPW Santos") and JTP Donna Glimpse ("JTP Glimpse"). CPW Santos acted as the team leader. However, Defendant PALMAR remained one of Plaintiff's direct supervisors.

25.   In or around the week of September 21, 2015, Plaintiff witnessed Defendant PALAMER and JTP Takisha Jones ("JTP Jones") in a compromising position in the Rosewood Park House. Plaintiff walked into the Rosewood Park House, at 6:00 a.m. to find JTP Jones on her knees, under a desk, performing oral sex on Defendant PALAMAR. Plaintiff ran out of the room, upon seeing this sexual act between Defendant PALAMAR and JTP Jones.

26.    Plaintiff then complained to CPW Santos and JTP Glimpse about what she had just witnessed. CPW Santos replied, "you have seen nothing yet, he has three JTPs!....The youngest [is] 19 years of age."

27.   In or around the end of September 2015/beginning of October 2015, PS-1 Frazier went on vacation.

28.   During this time, Plaintiff was eating a banana at her desk when Defendant PALAMAR asked Plaintiff if she "swallowed." Plaintiff responded, "what?!" In response, Defendant PALAMAR started laughing and said that he knows Bronx girls likes to swallow.

29.   Plaintiff objected to this question and told Defendant PALAMAR that his comment was offensive and made her feel uncomfortable.

4

30.     Defendant PALAMAR responded by stating that this is what JTPs are here for. Defendant PALAMAR continued that JTPs are "Just Temporary Pussy." Defendant PALAMAR then began laughing hysterically, before apologizing.

31.     Plaintiff immediately complained to JTP Glimpse, in the presence of CPW Santos. CPW Santos told Plaintiff that Defendant PALAMAR does that to all of the women employed with Defendants, NYC and P&R, through the HR/JTP. CPW Santos continued that women complain, but no one listens or hears them out, and they eventually stop coming to work.

32.     CPW Santos also informed Plaintiff that Defendant PALAMAR only recently came to the Rosewood Park House, after working at the Orchid Beach location.

33.     In addition, CPW Santos informed Plaintiff that the higher-ranking individuals know that Defendant PALAMER is sexually harassing woman. CPW Santos told Plaintiff that Defendants, NYC and P&R, attempted to investigate the sexual harassment; however, the women denied the allegations, when they were questioned, in fear of losing their jobs.

34.     In or around the first or second week of October, on a pay day, Plaintiff walked into the Rosewood Parkhouse with CPW Santos and JTP Glimpse. Upon entering, they witnessed JTP Jackie Oliviera ("JTP Oliviera") and JTP Teesha (Last Name Unknown) ("JTP Teesha") screaming at Defendant PALAMAR. The two women both accused Defendant PALAMAR of writing them up because they would not sleep with him. Plaintiff wrote a statement about this confrontation because the women escalated their threats against Defendant PALAMAR to death threats against everyone at the Rosewood Park House.

35.     In or around end of October 2015, Defendant PALAMAR was transferred to Ranaqua Headquarters, located at 1 Bronx River Parkway, Bronx, New York 10462 (the "Ranaqua Headquarters").

36.     On or about December 18, 2015, Plaintiff's HR/JTP position ended.

37.     By the end of 2015, Plaintiff developed bronchitis due to the poor conditions at work. Plaintiff was not provided with adequate equipment and attire to work.

38.     By way of example, Plaintiff was required to work at the Rosewood Park House, which stored gasoline and other hazardous materials. The conditions were so severe that employees were not be able to stay in the Rosewood Park House for long periods of times, forcing them out into the cold. Plaintiff was also required to use bleach to clean the Rosewood Park House and was not provided any mask to prevent the chemicals from entering her body. In fact, in or around June 2017, the Rosewood Park House was condemned as inhabitable.

39.     On or about March 22, 2016, Plaintiff received a phone call from Defendant PALAMAR, in reference to her application to become a CPW at Ranaqua Headquarters.

40.     Soon thereafter, Plaintiff was hired as a seasonal employee.

41.     As a CPW, Plaintiff's job duties were dangerous and the work conditions were deplorable. These job duties included driving a barely working garbage truck; cleaning up the parkway, parks, and surrounding areas; basic maintenance work, such as painting; closing the parks at night time.

42.     On or about June 28/29, 2016, Michael Gratton ("Mr. Gratton"), Deputy Chief of Defendant P&R, informed Plaintiff that her seasonal position was on a seasonal CPI line, and it would last from June 30, 2016 to June 30, 2017. Around this time, Brenda Hines ("Ms. Hines"), Senior Administrator over the Seasonal Employees, also informed Plaintiff that her job would last from June 30, 2016 to June 30, 2017.

43.     Since the beginning of Plaintiff's employment in this new position Plaintiff repeatedly

requested a copy of her employee contract, Union folders, basic onboard processing documentation, all of which one typically gets when hired. However, Plaintiff was repeatedly dismissed by Defendant PALAMAR; Maria Febus ("Ms. Febus"), Deputy Chief of Administration; PS-1 Perez; Ms. Hines; and Danny Ambrozino ("Mr. Ambrozino"), Plaintiff's Union Representative/Delegate, of Local 1505 for DC37.

44. In or around July 2016, during the 5:00 p.m. to 1:30 a.m. tour, Plaintiff inquired with Defendant PALAMAR about training and/or orientation, while they were in vehicle No. 5981. Defendant PALAMAR proceeded to put his hand on Plaintiff's left thigh and gripped it tightly. Plaintiff immediately objected and told Defendant PALAMER to get his hands off her leg. Defendant PALAMAR laughed it off and said, "now you are seasonal pussy."

45. Plaintiff was humiliated by Defendant PALAMAR's conduct and took this as clear discrimination against her based on sex (female).

46. Plaintiff was so distraught that she could not go to work the following day. Plaintiff was also fearful as she was the only female on tour and the only black employee.

47. In addition, Plaintiff was aware that black females in the HR/JTP Program, were Defendant PALAMAR's choice of women to sexually harass or discriminate against.

48. In or around July 2016, Plaintiff complained to Mr. Ambrozino. Plaintiff complained about the discrimination and harassment, to which Mr. Ambrozino stated that she was only a seasonal employee, so she should not complain too much, or she could be let go. **Plaintiff understood this to mean that she could get terminated if she continued to complain about the sexual harassment and discrimination**. Plaintiff also complained about not receiving a written contract for her position, to which Mr. Ambrozino stated that they do not give CPI Line information to the seasonal employees.

49.   In or around August 2016, Plaintiff again attempted to get information about her Seasonal CPI line position. Defendant PALAMAR replied, "oh, you're a seasonal, you don't matter. But, if you wrap those soup coolers around my dick, maybe I can get you some training." Plaintiff later learned that "soup coolers" was a reference to her lips.

50.   In or around September 2016, Plaintiff's work conditions began to become even more unsafe. By way of example, Defendants hired several male ex-convicts to work with the HR/JTP program. These men made many sexual advances and propositioned Plaintiff.

51.   For example, these male JTPs asked Plaintiff out for drinks; asked Plaintiff how she was with her husband; and if she had ever been with younger men. In addition, among other comments, the male JTPs told Plaintiff, "damn I didn't know your ass looked like that," as a reference to her buttocks, when they saw her in non-work attire; "your nipples are the size of quarters," and "your booty looks so voluptuous…I just want to bite it."

52.   On or about the end of August 2016, Plaintiff was discussing the sexual advances and discrimination she was facing, this conversation was overheard by Defendant PALAMAR. Upon hearing Plaintiff, Defendant PALAMAR inquired into what happened. Plaintiff told him that the male JTPs were not listening to her because she was female and that they were making sexual advances towards her. Plaintiff also complained that the male employees made comments, like "what you fucking bitches doing driving the trucks."

53.   Soon thereafter, Defendant PALAMAR held a staff meeting with the male employees and told them that they should be respectful to Plaintiff.

54.   In or around September 2016, Plaintiff learned that the permanent position that she applied for, back in July/August 2016, was given to a male employee, Richard Osario ("CPW Osario"). CPW Osario was a JTP, at the time.

55.    CPW Osario is a fair-skinned, Puerto Rican male.

56.    Prior to Plaintiff's interview, Plaintiff asked Defendant PALAMAR for advice about applying for the position that was later given to CPW Osario. Defendant PALAMAR told Plaintiff "closed legs don't get fed, and good luck" **Plaintiff understood this comment to mean that she would only be able to progress, in her career, if she gave into the sexual advancement. This was clear quid pro quo sexual harassment**.

57.    During Labor Day Weekend of 2016, Defendant PALAMAR grabbed Plaintiff's nipple and said, "oh, you got a bra on!" and laughed.

58.    **At this point, Defendant PALAMAR was sexually abusing and harassing Plaintiff on an almost daily basis, despite Defendant PALAMAR telling the male employees that they should be respectful towards Plaintiff**.

59.    Plaintiff consistently objected to these sexual advances.

60.    In an effort to intimidate Plaintiff, Defendant PALAMAR continued to tell her that she is a "black girl from the Bronx," and they are just going to get rid of her because Plaintiff was seasonal.

61.    On or about September 5, 2016, Defendant PALAMAR took Plaintiff into a designated office and told her it was her last day. Plaintiff responded that Ms. Hines advised her that the last day for her line was June 30, 2017. Defendant PALAMAR responded stating that "they" told him today, but could not tell Plaintiff who "they" were, when Plaintiff pushed for an answer. Defendant PALAMAR also told Plaintiff that "there's no more affirmative action…you people should be happy you got a job."

62.    On or about September 6, 2016, Plaintiff called Mr. Gratton to find out what happened to the rest of her line. Mr. Gratton informed Plaintiff that her line had not ended and does not

know what Defendant PALAMAR was talking about. He informed Plaintiff to come to work, as scheduled, and he would send an e-mail.

63.    On or about September 7, 2016, Plaintiff spoke to Ms. Febus. Plaintiff complained to Ms. Febus about not receiving her employee handbook and employee contract. Ms. Febus responded that she was a seasonal employee and did not need the information.

64.    On or about September 8th or 9th, Plaintiff also complained to Mr. Ambrozino about the sexual harassment and discrimination she faced, including but not limited to sexually harassing comments. In addition, Plaintiff inquired into who her delegate was, but Mr. Ambrozino could not tell Plaintiff anything.

65.    When Plaintiff inquired into a transfer to another location, because no one was doing anything to stop the sexual harassment, Mr. Ambrozino told Plaintiff that he was sorry to hear about what she was going through, but CPWs do not have transfer rights. When Plaintiff asked for that in writing, Mr. Ambrozino said there was not anything in writing, but that he would have the Union President call her. However, no one called Plaintiff.

66.    Upon information and belief, CPWs do have transfer rights.

67.    After Defendant PALAMAR tried to fire Plaintiff, his sexual verbiage and groping continued on a consistent basis. These comments included comments about Plaintiff's breasts, how good Plaintiff's buttocks look, and talking about him having sex with people.

68.    On multiple instances, Defendant PALAMAR told Plaintiff: (1) "Oh your titties look good in that"; (2) "your ass looks good"; (3) "you women should be home cooking"; and (4) "Hey how are you and your husband coming along…let me know when you need a comfort buddy."

69.    On multiple instances, when employees were washing cars, Defendant PALAMAR

sprayed Plaintiff with a hose, in order to see her nipples in her shirt.

70.     In other instances, Defendant PALAMAR would try to get Plaintiff alone, by sending the male employees to other locations to clean and would have Plaintiff clean locations closer to him.

71.     Making matters worse, almost the entire tour of male employees watched pornography all day. These male employees also talked about sexual encounters, yelled out of their vehicle windows at women, and made inappropriate comments of a sexual nature towards women.

72.     In or around October or November 2016, Plaintiff complained to Mr. Ambrozino about needing a work winter coat. Upon information and belief, all CPW's are provided a winter coat by Defendants, NYC and P&R. Mr. Ambrozino responded that she does not get one because she was seasonal. Plaintiff also asked him about who she should be talking to about her sexual harassment and discrimination complaints. Mr. Ambrozino advised Plaintiff that she should not complain about anything, until Defendants NYC and P&R make her permanent because if she does complain, Defendants, NYC and P&R, would let her go.

73.     Mr. Ambrozino also advised Plaintiff that seasonal employees who complained about anything were terminated and not called back for the following season.

74.     In or around this time, Plaintiff went to Deputy Chief Ray Acosta ("Deputy Chief Acosta") about her winter jacket request and uniform allowance. Deputy Chief Acosta later provided Plaintiff with her needed winter jacket, as well as, her uniform allowance.

75.     Between the months of October and December 2016, Plaintiff suffered a death in the family. At that point, Plaintiff and her family were short on cash and were unable to pay for the burial.

76.     Multiple employees came together and provided Plaintiff and her family with donations

and conducted grievance collections to help Plaintiff.

77.    One such employee, CPW Adib Anderson ("CPW Anderson"), offered Plaintiff $100.00. Plaintiff was uncomfortable accepting such a large amount, but promised to pay the $100.00 back when she was able to.

78.    When the next pay day arrived, Plaintiff returned the $100.00 to CPW Anderson. However, CPW Anderson stated that she owed him $300.00. CPW Anderson had not expressed Plaintiff owing him $300.00 before.

79.    From that day until Plaintiff's last day of work, Plaintiff was harassed by CPW Anderson for the additional money.

80.    In or around January 2017, CPW Anderson approached Plaintiff and told her, in substance: who you going to tell! I been here 7 years and you ain't supposed to be on this tour anyway. Women have no place in night security. You don't matter. You are only seasonal. They can fire you any time. But, you can pay me in other ways.

81.    Plaintiff understood CPW Anderson's comment to mean that Plaintiff can repay CPW Anderson in sexual favors.

82.    In or around January 2017, Defendant PALAMAR reduced Plaintiff's route from multiple team members to a team of two, while all other routes had several employees.

83.    Plaintiff worked Route No. 2, which is in the most dangerous area in the Bronx. Plaintiff's only partner rotated between JTP Felix (Last Name Unknown) ("JTP Felix") and JTP (First Name Unknown) Bush ("JTP Bush").

84.    Defendant PALAMAR also left Plaintiff out of all of the work-related discussions and trainings, and refused to provide Plaintiff with any overtime.

85.    Plaintiff had to work the day-shift, if she wanted any overtime. During the day-shift,

Plaintiff was assigned snow plow duty with the NYC Department of Sanitation.

86.   In or around January 2017, Plaintiff complained to APSW William Ward ("APSW Ward") about CPW Anderson's discrimination and harassment.

87.   Since the Inauguration of President Trump, Defendant PALAMAR made multiple discriminatory and racist statements in front of Plaintiff. This included, on or about August 2017, when Defendant PALAMAR stated, "you people are worried about black lives matter, y'all should be worried about hanging from trees soon…"

88.   Defendant PALAMAR also stated that President Trump was "his kind of President", Trump was "his kind of man," and that is why he voted for him. Defendant PALAMAR proceeded to laugh about the comments he made.

89.   After President Trump's first attempt at a travel ban, Defendant PALAMAR stated "We should send all the motherfuckers home….Blow them all up…" and "Lets make this country great again…no he meant, lets keep this country white again…"

90.   In or around March 2017, Plaintiff learned that she was the only seasonal employee who was working a 40-hour work week.

91.   In or around April 2017, Plaintiff inquired with Defendant PALAMAR about getting into the summer seasonal class. Defendant PALAMAR responded by stating that Plaintiff cannot get into the summer seasonal class, since she is only seasonal. When Plaintiff responded that was what the training was for, Defendant PALAMAR responded that she was not that kind of seasonal and refused to clarify as to what he meant, despite Plaintiff's insistence.

92.   When Plaintiff learned that the summer seasonal class was mandatory, Defendant PALAMAR told Plaintiff that "closed legs don't get fed. You do something for me, I do

something for you."

93.     On or around May 15, 2017, CPW Anderson's harassment of Plaintiff continued. For example, CPW Anderson spread rumors that Plaintiff was smoking marijuana and called the Park's Advocates to have them follow her around. CPW Anderson also told the JTPs that Plaintiff was a "bitch", "stupid bitch", that Plaintiff was "breaking up the boys' club," and that "Defendants need to let Plaintiff go."

94.     Plaintiff called Defendant PALAMAR and stated that she wanted to file a discrimination and harassment complaint. Defendant PALAMAR asked Plaintiff what she was going to tell them. Plaintiff responded that she does not need to tell him all of that. Defendant PALAMAR responded that he would get her the forms. However, nothing was given to Plaintiff and her complaint was ignored, yet again.

95.     On or about Friday, May 19, 2017, Plaintiff awoke with breathing issues, as her bronchitis began to flare up, and appeared to have hives. Plaintiff realized that she was sick again and contacted Dr. Trish Dean ("Dr. Dean"), her chiropractor for an appointment that day.

96.     Dr. Dean diagnosed Plaintiff with bronchitis, panic attacks and anxiety. Dr. Dean also referred Plaintiff to another doctor to treat her bronchitis.

97.     That day, Plaintiff called the call-out phone system to inform Defendants that she would be out until May 23, 2017.

98.     On May 24th, when Plaintiff returned to work, she provided PS-1 Jamie Perez ("PS-1 Perez") with a doctor's note. PS-1 Perez stated that Defendant PALAMAR instructed him to not put her doctor's note into the system and that Defendant PALAMAR would come and handle it.

99.     On or about Friday, May 26, 2017, CPW Anderson approached Plaintiff and told her she

14

was going to pay one way or another.

100.   On or about May 27, 2017, Plaintiff called Defendant PALAMAR and stated that she wanted to file a harassment complaint, against CPW Anderson. Defendant PALAMAR responded that he would get her the forms and then called the Park's Advocates, before giving Plaintiff the contact information for Hanice Tavares ("Ms. Tavares"), Chief Investigator, Parks Advocate.

101.   Later that day, Plaintiff left Ms. Tavares a voicemail.

102.   During this time, Plaintiff's sick time was still not put in as sick days and Defendant PALAMAR did not return Plaintiff's doctor's notes to her.

103.   On or about May 30, 2017, Plaintiff received a call from Ms. Tavares. Plaintiff explained her initial complaint that she made to APSW Ward about CPW Anderson. Plaintiff also explained CPW Anderson's illegal conduct with "loans" and selling marijuana, as well as, CPW Anderson's harassment and discrimination against Plaintiff, based on her gender. Plaintiff made clear that CPW Anderson did not treat the male employees in this manner.

104.   In addition, Plaintiff complained about the workplace sexual harassment, discrimination against her based on her race (black) and gender (female), as well as, alleged OSHA violations. In particular, Plaintiff complained about the discrimination and sexual harassment she faced at the hands of Defendant PALAMAR.

105.   Rather than provide Plaintiff with information on where to file a written complaint, or a time to come see her in person, Ms. Tavares simply replied that she would look into Plaintiff's complaint and advised Plaintiff to not tell anyone about their conversation.

106.   Plaintiff also provided Ms. Tavares with three witnesses, including JTP Clifford Scurdy ("JTP Scurdy"), JTP William Briscoe ("JTP Briscoe"), and JTP Tabias Carter ("JTP

Carter").

107.    Since May 2017, Defendant PALAMAR consistently asked Plaintiff about what happened with her complaint, what she complained about, who she spoke with, what agencies did she file her complaint with, and what did she tell them. Defendant PALAMAR also asked if she complained about more than CPW Anderson and if Plaintiff complained about him.

108.    On June 1, 2017, Defendant PALAMAR still did not give Plaintiff a copy of her doctor's note, nor did he put in her sick time, despite Plaintiff's requests for a copy and inquiry into if he inputted the information.

109.    Upon information and belief, Defendant PALAMAR used the tactic of withholding payroll documents as a punishment against those employees who used sick and personal time.

110.    After June 1, 2017, the atmosphere became even more hostile and uncomfortable.

111.    On or about June 3, 2017, Plaintiff drove Iris Rodriguez ("Ms. Rodriguez"), Bronx Park Commissioner, and Ms. Febus, during the Bronx Puerto Rican Day Parade. At the time, Plaintiff told Ms. Febus about the sexual harassment and discrimination she faced at the hands of Defendant PALAMAR, CPW Anderson's extortion attempts, and the poor working conditions, including Plaintiff being forced to work without a flashlight.

112.    On or about June 4, 2017, Plaintiff called Ms. Febus who advised Plaintiff to come to her office to pick up an EEO Form. However, after going to the Advocates and learning that Ms. Febus and other management employees were all tight knit, Plaintiff was not comfortable giving her the EEO Form. Plaintiff believed that nothing would be done in regard to her complaint and that Ms. Febus would share the complaint with the people Plaintiff complained of.

113.    At this point, Plaintiff complained to Ms. Febus about the sexual harassment, race

discrimination, and gender discrimination.

114.    On or about the following day, Plaintiff's health deteriorated based on the continued discrimination and sexual harassment and was thereby forced to take the day off. Plaintiff again went to visit Dr. Dean.

115.    Dr. Dean diagnosed Plaintiff with bronchitis and anxiety.

116.    On the evening of June 15, 2017, Plaintiff was accosted by CPW Anderson. When Plaintiff attempting to punch out for the day, CPW Anderson came into the office yelling at Plaintiff, stating "I want my fucking money Pee. Where the fuck is my money?" Plaintiff responded that, she does not owe him anything and she gave him everything she is going to give him.

117.    PS-1 Perez, JTP Felix, JTP Kevin (Last Name Unknown), CPW Erainer Mercer ("CPW Mercer"), and JTP Danny Rivera ("JTP Rivera"), were all present for this verbal assault.

118.    From June 16, 2017 to June 19, 2017, Plaintiff was on vacation.

119.    When Plaintiff returned to duty, she tried diligently to follow up on her complaints of discrimination with Ms. Tavares.

120.    On or about June 30, 2017, Plaintiff asked Defendant PALAMAR what did "seasonal employee" mean. Defendant PALAMAR responded, "oh you women get on my nerves. Just be lucky you got a job."

121.    Defendant PALAMAR threated Plaintiff's job by telling Plaintiff that she would be fired if she filed a complaint against him. He also stated that the Parks Department cannot touch him. He continued to tell Plaintiff that no one will believe a black girl from the Bronx and he has the City of New York Parks Department behind him.

122.    **Plaintiff understood this comment to mean that Defendants, NYC and P&R, were acquiescing to Defendant PALAMAR's sexual harassment**.

123.    Defendant PALAMAR again told Plaintiff that "there's no more affirmative action…you people should be happy you got a job."

124.    In or around late June 2017, Plaintiff was informed by an employee of the Administration office that her folder was being pulled, but the employee did not know why. Plaintiff believed that it was being pulled because she was being re-evaluated for an extension to her seasonal CPI line.

125.    In or around July 2017, Plaintiff was approach by numerous individuals who told Plaintiff that Defendant PALAMAR stated that Plaintiff would be gone soon. Plaintiff was confused, as she had never been written up for anything.

126.    On or about July 15, 2017, Plaintiff saw Barry Stultivant ("Mr. Stultivant"), a Manager at Ranaqua Headquarters. Plaintiff complained to him about everything she had to endure under Defendant PALAMAR's supervision and about her previous complaints to the Parks Advocates. Mr. Stultivant advised Plaintiff to call EEO and informed Plaintiff that he would inform Anthony Bromell ("Mr. Bromell"), another Manager for the Ranaqua Headquarters, to call Plaintiff about her complaints. In addition, Mr. Stultivant informed Plaintiff that the conditions Plaintiff was facing provided her the transfer rights that she was asking for.

127.    In or around mid-July 2017, Plaintiff learned that she was locked out of the common fridge, used by all employees. Upon information and belief, all other employees were given a key to access the fridge, except her.

128.    On or about August 6, 2017, in response to Plaintiff's request for a flashlight Defendant PALAMAR responded that "oh we put lights, but the blacks and spics, and the gang members, bust them out, so ya'll could do your dirt and ya'll could sell their drugs and

18

….maybe you can get a flashlight, if you give me some."

129.   On or about August 15, 2017, Plaintiff received an informal Conference Letter, stating that The Advocates of the New York City Department of Parks and Recreations were bringing charges up against Plaintiff for falsifying medical documents. **This letter was in retaliation for Plaintiff's numerous complaints of sexual harassment and discrimination**.

130.   On or about August 17, 2017, Defendants, NYC and P&R, held an informal conference. This conference was held without Plaintiff, despite her calling them to inform them she was running late because she was sent to the wrong location. ("Informal Hearing").

131.   On or about August 18, 2017, Plaintiff informed Mr. Bromell about the discrimination, sexual harassment, and being accused of falsifying documents.

132.   On or about August 21, 2017, Plaintiff arrived at the Administration's Office to look at her personnel file. Plaintiff was greeted by Ms. Febus and Susan Lonergan ("Ms. Lonergan"), Chief of Administration Services. The only document in her file was her application. Plaintiff was confused because Defendant PALAMAR stated that he made two copies of all her documentation and doctors' notes, and placed one copy in her file at the Ranaqua Headquarters and another, along with the original, for her file at 61st Street office.

133.   At this point, Plaintiff decided to go to her locker, retrieve her cooler, and go home. However, upon returning to her locker, Plaintiff found a manila envelope jammed in her locker, between the lock and the doors.

134.   Plaintiff opened the envelope to see a racist and sexist threat. The document was a print out of a news article from November 24, 2013 about Defendant PALAMAR. **There was also a handwritten note on it stating, "Back off you Black Bitch!!" and "You should've**

**kept your mouth shut!"**

135. In addition, the article quotes another victim of Defendant PALAMAR who stated, "it's horrible…He can do whatever he wants to do and not even [get] a slap on the wrist? …. He gets to do the same thing? Really?"

136. Upon seeing this, Plaintiff went back to Ms. Febus and Ms. Lonergan to inquire what the article was about. However, Ms. Lonergan was more concerned with Plaintiff's cooler. Ms. Lonergan continued to ignore Plaintiff and complained that the cooler was Defendant P&R property. In response, Plaintiff gave her the cooler. In addition, Ms. Lonergan tried to snatch the article from Plaintiff. When Ms. Febus saw the article, she was shocked. But, Ms. Lonergan only said that it was from a few years ago and again disregarded the article.

137. Plaintiff filed an incident report with Defendants, NYC and P&R. In response, Ms. Lonergan again stated that it did not mean anything because Plaintiff did not see who put the letter in Plaintiff's locker. Plaintiff also requested a transfer out of the Ranaqua Headquarters, but was advised that she still did not qualify for a reasonable accommodation, in the form of a transfer. Ms. Lonergan continued that, even if it did, CPWs do not have transfer rights.

138. Upon information and belief, CPWs do have transfer rights.

139. Plaintiff also filed an incident report with the police at the 49th Precinct.

140. On or about August 25th, Plaintiff received a determination letter from the Informal Hearing. This determination letter stated that Plaintiff was terminated and guilty of all charges, despite Plaintiff not being able to defend herself. This letter also gave Plaintiff only five (5) business days to appeal the hearing, from receipt of the letter.

141. On or about August 28th, Plaintiff received a letter, dated August 24, 2017, from Dilcy

Benn ("Ms. Benn"), President of Local 1505 for DC37, stating that Plaintiff has a seasonal review regarding her termination, on Tuesday, September 19, 2017 at 12:00 pm..

142. **Plaintiff has not returned to work since August 18th because of the hostile work environment she faces due to her race (black) and gender (female)**.

143. Since in or around August 2017, Plaintiff has been fighting her termination through the grievance process.

144. On or about September 5, 2017, an employee at the Park's Advocates, told Plaintiff that she was terminated.

145. Upon information and belief, Defendant PALAMAR continues to work for Defendants, NYC and P&R.

146. In addition, upon information and belief, Defendant PALAMAR has attempted to proposition multiple other women, by asking them, "have you ever been with a white man?" and essentially publicizing his wages, to bate women into sleeping with him because he makes a lot of money, compared to them.

147. As of the date of this Complaint, Plaintiff has not received any updates from her grievance process.

148. Plaintiff was unlawfully treated, humiliated, degraded, victimized and embarrassed and, as a result, suffers loss of rights, emotional distress, and physical ailments and injuries.

149. Defendants' actions and conduct were intentional and intended to harm Plaintiff.

150. As a result of the acts and conduct complained of herein, Plaintiff has suffered and will continue to suffer emotional pain, inconvenience, loss of enjoyment of life, and other non-pecuniary losses. Plaintiff has further experienced severe emotional and physical distress.

151. Defendants' conduct has been malicious, willful, outrageous, and conducted with full

knowledge of the law. As such, Plaintiff demands punitive damages as against all the Defendants, jointly and severally.

**FIRST CAUSE OF ACTION
FOR DISCRIMINATION UNDER TITLE VII
(Not Against Individual Defendant)**

152.    Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint.

153.    This claim is authorized and instituted pursuant to the provisions of Title VII of the Civil Rights Act of 1964, 42 U.S.C. Section(s) 2000e et. seq., for relief based upon the unlawful employment practices of the Defendants. Plaintiff complains of Defendants' violation of Title VII's prohibition against discrimination in employment based, in whole or in part, upon an employee's gender and race.

154.    Defendants, NYC and P&R, engaged in unlawful employment practices prohibited by 42 U.S.C. §2000e et. seq., by discriminating against Plaintiff because of her race (black) and gender (female).

**SECOND CAUSE OF ACTION
FOR RETALIATION UNDER TITLE VII
(Not Against Individual Defendant)**

155.    Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint.

156.    Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-3(a) provides that it shall be unlawful employment practice for an employer:

> (1) to . . . discriminate against any of his employees . . . because [s]he has opposed any practice made an unlawful employment practice by this subchapter, or because [s]he has made a charge, testified, assisted or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

157.   Defendants, NYC and P&R, engaged in unlawful employment practice prohibited by 42

U.S.C. § 2000e et. seq. by discriminating against Plaintiff with respect to the terms, conditions

or privileges of employment because of her opposition to the unlawful employment practices

of the Defendants, NYC and P&R.

**AS A THIRD CAUSE OF ACTION FOR DISCRIMINATION
UNDER THE NEW YORK STATE EXECUTIVE LAW**

158.   Plaintiff repeats and realleges each and every allegation made in the above paragraphs of

this Complaint as if more fully set forth herein at length.

159.   Executive Law § 296 provides that,

> 1. It shall be an unlawful discriminatory practice: (a) For an
> employer or licensing agency, because of an individual's age, **race**,
> creed, color, national origin, sexual orientation, military status, **sex**,
> disability, predisposing genetic characteristics, marital status, or
> domestic violence victim status, to refuse to hire or employ or to bar
> or to discharge from employment such individual or to discriminate
> against such individual in compensation or in terms, conditions or
> privileges of employment.

160.   Defendants engaged in an unlawful discriminatory practice by discriminating against

Plaintiff because of her race (black) and gender (female).

**AS A FOURTH CAUSE OF ACTION FOR DISCRIMINATION
UNDER THE NEW YORK STATE EXECUTIVE LAW**

161.   Plaintiff repeats and realleges each and every allegation made in the above paragraphs of

this Complaint as if more fully set forth herein at length.

162.   Executive Law § 296 provides that, "7. It shall be an unlawful discriminatory practice for

any person engaged in any activity to which this section applies to retaliate or discriminate

against any person because he or she has filed a complaint, testified, or assisted in any

proceeding under this article."

163.   Defendants engaged in an unlawful discriminatory practice by discriminating against

Plaintiff because of her opposition to the unlawful employment practices of the Defendants.

## AS A FIFTH CAUSE OF ACTION
## UNDER THE NEW YORK STATE EXECUTIVE LAW

164.    Plaintiff repeats, reiterates and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

165.    New York State Executive Law §296(6) provides that it shall be an unlawful discriminatory practice: "For any person to aid, abet, incite compel or coerce the doing of any acts forbidden under this article, or attempt to do so."

166.    Defendants engaged in an unlawful discriminatory practice in violation of New York State Executive Law §296(6) by aiding, abetting, inciting, compelling and coercing the discriminatory conduct.

## AS A SIXTH CAUSE OF ACTION FOR DISCRIMINATION
## UNDER THE NEW YORK CITY ADMINISTRATIVE CODE

167.    Plaintiff repeats, reiterates and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

168.    New York City Administrative Code §8-107(1) provides that

> It shall be an unlawful discriminatory practice: (a) For an employer or an employee or agent thereof, because of the actual or perceived age, **race**, creed, **color**, national origin, **gender**, disability, marital status, sexual orientation or alienage or citizenship status of any person, to refuse to hire or employ or to bar or to discharge from employment such person or to discriminate against such person in compensation or in terms, conditions or privileges of employment.

169.    Defendants engaged in an unlawful discriminatory practice in violation of New York City Administrative Code §8-107(1)(a) by creating and maintaining discriminatory working conditions, and otherwise discriminating against Plaintiff because of her race (black) and gender (female).

24

## AS A SEVENTH CAUSE OF ACTION FOR DISCRIMINATION
## UNDER THE NEW YORK CITY ADMINISTRATIVE CODE

170.  Plaintiff repeats, reiterates and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

171.  The New York City Administrative Code §8-107(7) provides that it shall be unlawful discriminatory practice: "For an employer . . . to discriminate against any person because such person has opposed any practices forbidden under this chapter. . ."

172.  Defendants engaged in an unlawful discriminatory practice in violation of New York City Administrative Code §8-107(7) by discriminating against Plaintiff because of Plaintiff's opposition to the unlawful employment practices of the Defendants.

## AS A EIGHTH CAUSE OF ACTION FOR DISCRIMINATION
## UNDER THE NEW YORK CITY ADMINISTRATIVE CODE
## (Against Individual Defendant)

173.  Plaintiff repeats, reiterates and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

174.  The New York City Administrative Code §8-107(6) provides that it shall be unlawful discriminatory practice: "For any person to aid, abet, incite, compel; or coerce the doing of any of the acts forbidden under this chapter, or attempt to do so."

175.  Defendant PALAMAR engaged in an unlawful discriminatory practice in violation of New York City Administrative Code §8-107(6) by aiding, abetting, inciting, compelling and coercing the above discriminatory, unlawful and retaliatory conduct.

## JURY DEMAND

176.  Plaintiff hereby requests a jury trial.

**WHEREFORE**, Plaintiff respectfully requests a judgment against the Defendants:

A.    Declaring that Defendants engaged in unlawful employment practices prohibited by **Title**

25

**VII of the Civil Rights Act of 1964**, the **New York State Human Rights Law**, and the **New York City Human Rights Law**, in that Defendants subjected Plaintiff to race and gender discrimination, and retaliation;

B.      Awarding damages to Plaintiff for all lost wages and benefits, past and future, back pay and front pay, resulting from Defendants' unlawful employment practices and to otherwise make Plaintiff whole for any losses suffered as a result of such unlawful employment practices;

C.      Awarding Plaintiff compensatory damages for mental, emotional and physical injury, distress, pain and suffering and injury to reputation;

D.      Awarding Plaintiff punitive damages;

E.      Awarding Plaintiff attorneys' fees, costs, and expenses incurred in the prosecution of the action;

F.      Awarding Plaintiff such other and further relief as the Court may deem equitable, just and proper to remedy the Defendants' unlawful employment practices.

Dated:  New York, New York
        July 11, 2018

                            **PHILLIPS & ASSOCIATES,**
                            **ATTORNEYS AT LAW, PLLC**

                            Marjorie Mesidor, Esq.
                            Brittany A. Stevens, Esq.
                            *Attorneys for Plaintiff*
                            45 Broadway, Suite 620
                            New York, New York 10006
                            T: (212) 248 – 7431
                            F: (212) 901 – 2107
                            mmesidor@tpglaws.com
                            bstevens@tpglaws.com



U.S. Department of Justice
Civil Rights Division
NOTICE OF RIGHT TO SUE WITHIN 90 DAYS

CERTIFIED MAIL
7016 2140 0000 5581 5308

*950 Pennsylvania Avenue, N.W.*
*Karen Ferguson , EMP, PHB, Room 4701*
*Washington, DC 20530*

June 22, 2018

Ms. Pilar B. Taylor
c/o Brittany A. Stevens, Esquire
Law Offices of Phillips & Assocs.
45 Broadway, Suite 620
New York, NY 10006


RECEIVED
JUN 2 9 2018
BY: KG

Re: EEOC Charge Against New York City, Dept. of Parks & Recreation
    No. 520201800575

Dear Ms. Taylor:

Because you filed the above charge with the Equal Employment Opportunity Commission, and more than 180 days have elapsed since the date the Commission assumed jurisdiction over the charge, and no suit based thereon has been filed by this Department, and because you through your attorney have specifically requested this Notice, you are hereby notified that you have the right to institute a civil action under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. 2000e, et seq., against the above-named respondent.

If you choose to commence a civil action, such suit must be filed in the appropriate Court within 90 days of your receipt of this Notice.

The investigative file pertaining to your case is located in the EEOC New York District Office, New York, NY.

This Notice should not be taken to mean that the Department of Justice has made a judgment as to whether or not your case is meritorious.

Sincerely,

John M. Gore
Acting Assistant Attorney General
Civil Rights Division

by *Karen L. Ferguson*
Karen L. Ferguson
Supervisory Civil Rights Analyst
Employment Litigation Section

cc: New York District Office, EEOC
    New York City, Dept. of Parks & Recreation